312 So.2d 406

**Donny HAYNES, alias**

v.

**STATE.**

**6 Div. 667.**

Court of Criminal Appeals of Alabama.

Feb. 4, 1975.

Rehearing Denied April 1, 1975.

Stewart & Colvin, Anniston, for appellant.

William J. Baxley, Atty. Gen., and Eric A. Bowen, Asst. Atty. General, for the State.

CATES, Presiding Judge.

Possession of "marijuana" [sic] for personal use: fine, $500.00 and six months hard labor for the county.

 Haynes was indicted in 1973 for possession of "marijuana" on March 17, 1973. The verdict and judgment entry show a finding of guilt of possession of "marijuana" [1] for his personal use only.

1. The State used as its expert Gerald Wayne Burrow. He had a B. S. in chemistry from Florence State University and had worked for the State Department of Toxicology for a year. He had made between three hundred and three hundred fifty examinations of marijuana.

On the instant cigarettes Burrow used a chemical test, the Duquenois-Levine Color Test. At least one writer has criticized this test because, inter alia, it gives false positive indications for non-tetrahydrocannabinols, such as coffee, coffee grounds and some m-hydroxyphenols. Stein, et al., 1973 Wisconsin Law Rev. at 736, 746. Indeed, we are told that the Wisconsin Crime Laboratory has warned that this test (among others) is "not sufficient for court." —ibid, at 747.

However, no objection or motion to exclude the results of this test was made, except as follows:

"Q And the tests that you told us about, are those tests accepted and recommended by the . . . (interrupted)

"MR. STEWART: Judge, I'm going to object to that. He's not qualified other than just as a chemist. He's not qualified him to testify about these tests. He's indicated that the only training he's had on this particular thing is on-the-job training.

"THE COURT: All right, sir. Overruled.

"MR. STEWART: We except.

"Q Sir, the tests that you've told the jury about that you performed on this substance —is that test recognized in the field of drug identification?

"A Yes, it is.

"Q And is it recognized and recommended by the Bureau of Narcotics and Dangerous Drugs?

"MR. STEWART: Judge, we're going to object to his testifying as to what is rec-

See § 401(a) of Act No. 1407, September 16, 1971.

## I

Alexander Pope said, among many other things:

"Be not the first by whom the new are tried,

Nor yet the last to lay the old aside."

—Essay on Criticism, Part II, l. 133

Our Legislature, importuned by siren voices, abandoned a set of drug laws already mainly interpreted by the appellate courts to pass the Uniform Controlled Substances Act. Act No. 1407, September 16, 1971. See The Uniform Alabama Controlled Substances Act: An Appraisal, 24 Ala.Law Review 491.

In this course of novation (and repeal) our lawmakers came up with a brand new definition of what they now chose to call "marihuana." Beforehand the law stood thus:

"Section 256. Unlawful to sell marijuana, etc.—It shall be unlawful for any person to possess, transport, deliver, sell, offer for sale, barter, or give away in any form whatever in this state, any marijuana, cannabis Americana, or cannabis Indica, or any compound or mixture containing any marijuana, cannabis Americana or cannabis Indica, or any derivative therefrom or thereof or synthetic equivalents of the substances contained in the plant, or in the resinous extractives of Cannabis or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity such as tetrahydrocannabinol and its optical isomers, or any cigar or cigarettes made of or containing any marijuana, cannabis Americana or cannabis Indica or such synthetic equivalents or derivatives." Code 1940, T. 22, § 256 as amended by Act 625, August 29, 1969.

This § 256 was effectively, though malapropishly, repealed by § 508(b), (6) and (7) of Act 1407, supra.

In lieu of this *enumerative* classification built around the *chemical* characteristics of the cannabis plant in all its varieties and synthetic derivatives, the 1971 Act (No. 1407, September 16, 1971) § 101(*o*) substituted the following *taxonomic definitive* nomenclature, viz:

" 'Marihuana' *means* all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination." (Italics added.) 1971 Acts pp. 2378–2402, at p. 2380.

Thus, we have a switch from "marijuana" as a broad congeries of plant substances, compounds, mixture derivatives,

ommended by the Bureau of Narcotics and Dangerous Drugs. What they recommend or what they write—this man has not been qualified as having those kind of qualifications.

"THE COURT: All right, sir. Overruled.

"MR. STEWART: Except.

"Q You may answer.

"A Yes, it is."

We find no error. We consider that the enquiry was within the realm of further expert testimony which was not adduced as to the Duquenois-Levine Test. The defense expert, Dr. Sharp, was "roughly" familiar with this test but didn't use it. Apparently Sharp confined himself to "plant identification" rather than drug identification.

It was open to defendant to argue to the jury any claimed deficiencies in the opinion evidence, i. e., as to its weight. Juries, being the sole judges of facts, are free to disregard experts. See State v. Parker, 9 Wash.App. 970, 515 P.2d 1307.

synthetic equivalents, or extractives, etc., as listed illustratively in the 1969 amendment of § 256, supra.

The change from "marijuana" to "marihuana" went from showing the lawmakers' meaning by way of description (or illustration) over to a purported precise definition, i. e., of equivalency. Thus, in Helvering v. Morgan's, Inc., 293 U.S. 121, 55 S.Ct. 60, 79 L.Ed. 232, we find:

"* * * Section 200 * * * gives four [definitions] of which two use the verb 'include' and two the verb 'means.' That the draftsman used these words in a different sense seems clear. The natural distinction would be that where 'means' is employed, the term and its definition are to be interchangeable equivalents, and that the verb 'includes' imports a general class, some of whose particular instances are those specified in the definition. * * *." (Bracketed matter added.)

Hence, in § 101 of The Uniform Alabama Controlled Substances Act, supra, the section uses the verb "means" twenty-two times and "includes" or "including" twelve times, in seven instances accompanied by "not" so as to be the same as "excluding."

This usage comports with the observation of distinction noted in Helvering v. Morgan's, Inc., supra. As pointed out by McCall, J., in Sims v. Moore, 288 Ala. 630, 264 So.2d 484, "including" is not a word of limitation but rather one of enlargement.

In the course of the defense, counsel for Haynes put on the stand Dr. Aaron John Sharp, Professor of Botany at the University of Tennessee at Knoxville. Out of the hearing of the jury Dr. Sharp testified that in his opinion the term cannabis sativa L. omitted other botanical types of cannabis which were chemically indistinguishable from the statutorily defined substance.

The trial judge refused to permit testimony tending to establish the opinion of the witness that there exists more than one species of cannabis. The necessary implication of Professor Sharp's opinion would be that the statute § 101(o), by confining itself solely to cannabis sativa L., has decriminalized possession and sale of other varieties.

Perhaps the most concise writing we have found on the subject is in Stein, Laessig and Indriksons, An Evaluation of Drug Testing Procedures Used by Forensic Laboratories and Qualifications of Their Analysts, 1973 Wisconsin Law Review 727. At p. 767, we find:

"The term marihuana is not a scientific name; it is a colloquialism. Statutes, however, define marihuana in two ways, botanically and chemically. Botanical taxonomical classification describes a plant by a genus and species name. Using the genus and species name, many statutes define marihuana as Cannabis sativa L. Cannabis is the genus name; sativa is the species name; and L. stands for Linnaeus who discovered and described marihuana.

"The difficulty with the botanical statutory definition of marihuana, C. sativa L., is that there may be more than one species of Cannabis. Most forensic analysts believe Cannabis is a monotypic genus; that is, it has only one species. However, Professor F. Rickson of Oregon State University, Professor R. E. Schultes of Harvard, and Dr. W. Klein, Assistant Director of the Missouri Botanical Gardens, all of whom are botanists, have testified that they believe there are two other species of Cannabis, C. ruderalis and C. indica. Authoritative treatises have also recognized the existence of more than one species of Cannabis. If Professor Rickson and his colleagues are correct and there are more than one species of Cannabis, the statutory definition C. sativa L. is defectively under-inclusive.

"The species controversy centers on whether the morphological differences observed in various Cannabis plants are

genetic or environmental. If the differences are genetic, then there is more than one species. If the differences are due to geographic and environmental factors such as variations in temperature, soil chemistry, humidity, or length of daylight period, then there is only one species. The problem becomes more complicated because the observed differences may be due to both factors. The authors are of the view that the morphological differences are genetic and that there are more than one species of Cannabis. *Flora Europea*, a leading authority, supports this position, for it cites instances where both C. sativa L. and C. ruderalis were grown under essentially the same environmental conditions in Southeast Russia and were found to have different nut (seed) types, indicating a true species difference.

"The significance of this to the lawyer is that if there are more than one species, arguably the prosecution must prove that the unknown suspected vegetable material is C. sativa L. and not C. ruderalis or some other species. Since the only way to distinguish C. sativa L. from C. ruderalis is through comparison of their nuts, the absence of nuts in a sample, which is a fairly common occurrence, makes positive identification impossible. If a court were to accept this two-species argument in a jurisdiction where the statutes defined marihuana as C. sativa L., a defendant charged with possession of the drug might be acquitted due to the prosecution's failure to sustain its burden of proof.

"To date, few courts have been willing to recognize the argument. United States v. Rothberg [480 F.2d 534, 2 Cir.] typifies the judiciary's approach to the problem. There the court rejected an offer of proof regarding the existence of more than one species of Cannabis. Although the court tacitly conceded that the species C. indica existed, it found that Congress not only meant to, but actually did, include C. indica in the term

C. sativa L. More recently, however, a defendant successfully pressed the argument. In April 1973, a Florida jury acquitted a Miami teenager charged with possession of marihuana after hearing the testimony of Professor R. Schultes who testified to the existence of three species of marihuana, of which only one was illegal under the Florida statute. He further stated that the three species are easily distinguishable while green, but that once they are dried, testing procedures are inadequate to distinguish the illegal C. sativa from the legal C. indica and C. ruderalis. Thus, despite the line of cases represented by *Rothberg*, the issue remains unsettled. Moreover, the verdict of the Florida jury attests to the inadequacy of present statutes which rely on botanical definitions.

"The ambiguity of statutes proscribing marihuana is further exemplified by the problem of hashish. Hashish, the resinous extract of marihuana, is thought to be covered by the chemical description of marihuana. Typically, '[t]he term "marihuana" means all parts of the plant Cannabis sativa L., . . . the resin extracted from any part of such plant; . . . .' Resin or resinous extract is not defined; it is a very broad term. Depending on which solvent is employed in the extraction process, different compounds will be extracted. Therefore, the 'resin estracted' will have a different chemical composition depending on the nature of the extracting solvent and the conditions employed. Yet, most forensic analysts assume "resin extracted" means that extract which contains marihuana's pharmacologically active ingredient, THC.

"A solution to the ambiguities illustrated by the marihuana species controversy and the 'resin extracted' proscription of hashish is offered by statutes which define marihuana chemically. These statutes prohibit the sale or possession of substances containing tetrahydrocannabinols or THC. This approach is preferable to relying on a botanical

definition since the state's objective is to prohibit the use of the pharmacologically active ingredient, THC, regardless of its source. Moreover, by focusing on THC, the species argument would be mooted since, if there is a species C. ruderalis, it most likely contains THC. The forensic analyst would then not have to worry about botanical problems, which are usually beyond his expertise. An unknown sample would be treated just as any other drug is treated."

See also 2 Drug Abuse Law Review xliv.

Our new statute includes THC in Schedule I. See § 204(d)(17). However, the appellant was not indicted in those terms for the possession of tetrahydrocannabinols, but for possession of "marijuana."

■ Had the indictment been for having "marihuana," and been limited to cannabis sativa L. we think Dr. Sharp's testimony would have been relevant and admissible. Jenkins v. State, 46 Ala.App. 719, 248 So. 2d 758; United States v. Collier (D.C.Super., March 19, 1974) 14 Cr.L. 2501.

■ However, here the State used the older more general term "marijuana." This term, both in statutory prior usage and in common parlance, comprehended the chemical classification rather than that of taxonomy. Hence, the defendant was apprised by the indictment that he was accused of possessing a substance containing the incriminating ingredient of THC—tetrahydrocannabinol.

In Rothberg v. United States, 480 F.2d 534, the Second Circuit rejected the polytypal classification of marihuana because the statute there applicable was adopted in 1937 when " * * * the lawmakers, the general public and overwhelming scientific opinion considered that there was only one species of marihuana * * *." See United States v. Gaines, 5 Cir., 489 F.2d 690.

We quote from *Rothberg, supra*:

"The most that the proffered proof could have established was that at the time of trial there was some and perhaps growing botanical opinion that Cannabis is polytypal and that a distinction can be made between Cannabis Sativa L. and Cannabis Indica Lam. This opinion was, however, formed by appellant's experts only after the offense here in question. At the time of the enactment and amendment of the statutes in 1937 and 1956 and up to the time of the offense, there is no question but that the lawmakers, the general public and overwhelming scientific opinion considered that there was only one species of marihuana so that this Afghan hemp was included within the statutory definition. *See* Leary v. United States, 395 U.S. 6, 50, 89 S.Ct. 1532, 23 L.Ed.2d 57 and n. 106 (1969). Whether this is scientifically exact or not, the statute provided at the time of the offense a sufficient description of what was intended to be prohibited to give notice to all of the illegality of appellant's actions.

"To be sure, the use of a term in a criminal statute by a legislature under a misapprehension as to the object described by it could not be corrected by a criminal court's amendment of the statute, but that is not the case here. There was no misapprehension by the Congress as to the generally accepted meaning of the term when used, and no showing under the offer of proof of any change in the generally accepted meaning up to the time of the offense. The statute as written must be read to cover the offense charged.

"For the future, it would appear that the question is academic, since the statute has been replaced by the present drug abuse prevention and control acts, with much broader descriptions of controlled drugs in addition to the description in question here, the broader descriptions concededly covering this substance whether described as one designation of Cannabis or another."

Using this analogy of the chronological point of departure, we have in 1971 a statute using two terms "marihuana" and "te-

trahydrocannabinols." That the latter embraces chemically that which is covered by the dictionary word "marijuana" we do not doubt.[2] See last quoted paragraph from Stein, et al., supra.

 That the court below accepted the verdict of guilty of possession for personal use, thus convicting Haynes of a misdemeanor only, is not cause for reversal. We consider possession of marihuana for personal use only to be an offense embraced in a charge of possession of either tetrahydrocannabinols or marihuana. We see no problem under Cole v. Arkansas, 333 U. S. 196, 68 S.Ct. 514, 92 L.Ed. 644.

The judgment below is

Affirmed.

TYSON and BOOKOUT, JJ., concur herein.

TYSON, J., files opinion.

HARRIS and DeCARLO, JJ., concur in the result.

TYSON, Judge (concurring).

I concur in the learned discussion of the most recent developments of the law with reference the subject "marijuana," or "marihuana," as set forth in the opinion of our distinguished Presiding Judge in this cause.

Because human knowledge is ever increasing, and the statutory regulation of this subject a changing one, I wish to call to the attention of the Bench and Bar of this State an article prepared by the Drug Enforcement Administration of the Department of Justice published in the summer of 1974. This article bears the title, "LEGAL CORNER," THE FEDERAL DEFINITION OF MARIHUANA: A RESPONSE TO ATTACK.

From this article:

*"Legislative History*

"A good summary of the legislative history on which the courts rely is contained in the *Rothburg* case, E.D.N.Y., 351 F.Supp. 1115. The legislative history of the 1970 Controlled Substances Act indicates an intent by Congress to continue the same types of definitions that existed under prior legislation by stating in regard to Section 202 that:

" 'Subsection (c) sets out the various narcotics, *marihuana*, stimulants, depressants, hallucinogens, and immediate precursors *controlled* under present law. . . .' 1970 U.S.C.Cong.Admin.News, P. 4605. (Emphasis added)

*"Response to an Attack*

"If the definition of marihuana is attacked in a criminal prosecution, the

---

2. In the course of the original *Peppers* opinion (Ala.Cr.App., 304 So.2d 39) reference was made to State v. Romero, 74 N.M. 642, 397 P.2d 26, and part of the *Romero* opinion was quoted with a concluding paragraph that marijuana as a matter of law is identical with cannabis, cannabis sativa L. and cannabis indica. Under the then extant New Mexico Narcotic Drug Act, particularly § 54–7–2, subsection (15) this conclusion was correct. We do not have the same statutory structure. The variations from that statute, in contrast with ours hereof concern, preclude us from transplanting a similar conclusion into our present Alabama Uniform Controlled Substance Act.

The opinion in *Peppers*, supra, says, inter alia:

"It is not contended by appellant that a failure to identify the marijuana by its botanical name of Cannabis sativa L., as provided by the statute, precluded a conviction, * * * ."
Then follows part of the *Romero*, supra, opinion.
A careful reading of the entire *Peppers* opinion, including the extension on rehearing, discloses that this court did not give any legal definition apart from alluding to § 101(o) of the Alabama Uniform Controlled Substance Act. It was pointed out that mere observance of a material could not invoke judicial knowledge to determine whether or not it was legal marijuana (or marihuana).

Government must be prepared to respond that:

"1. The federal district courts and reviewing courts have consistently held that the intent of Congress was to control all types of marihuana falling under the *historical* purview of 'Cannabis sativa L.' This is a question of law, not a question for the jury. This decision is independent of whether cannabis is now considered polytypic.

"2. If a technical defense is successfully raised, the Government must be prepared to call a taxonomist of equal qualifications to the defense expert. The Government should stress the classification which was intended in the statute, with an emphasis on historical classifications.

"3. The problem concerning the definition of marihuana can be avoided by charging the substance as one or more of the 'Tetrahy-hydrocannabinols' which are separately listed as Schedule 1 controlled substances. 21 U.S.C. 812.

"4. In the future a legislative change may be necessary. At the present time, however, the existing definition has been uniformly interpreted by every federal district court and reviewing court to cover all types of marihuana included within the historical understanding of the term 'Cannabis sativa L.'"

ON REHEARING

CATES, Presiding Judge.

■ Appellant contends that we have said that, as to marihuana, the Controlled Substances Act is ambiguous. This, if true, would lead to its being void for vagueness.

We do not agree. The writer's opinion may have indulged in convolutions. However, the Act is, if anything, overexplicit in this area.

In other words, it prohibits possession of both "marihuana" and THC. The indictment was for possessing "marijuana."

Application overruled.

All the Judges concur.